IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

**Tyrone Henderson,**
on behalf of himself and others similarly
situated,

        Plaintiff,

      v.

**Verifications Incorporated**,

        Defendant.

Civil Action No.  3:11cv514-REP

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT,
AND AN AWARD OF INCENTIVE PAYMENT, ATTORNEYS FEES**

Plaintiff, on behalf of himself and the Class, respectfully submits this memorandum in support of final approval of the class settlement reached in this case. Class Counsel herein also petition the Court for an award of attorneys' fees and for the reimbursement of their out-of-pocket expenses incurred in furtherance of litigating this matter to the successful result now before this Court for final approval.

I.    **OVERVIEW**

This class settlement is made on behalf of consumers who were the subject of an employment-purpose consumer report, or background check, by Verifications Incorporated, ("Verifications").  After contentious litigation between two teams of attorneys, Class Counsel moves the Court to provide final approval to the $3.75 million cash settlement.   In addition, Class Counsel asks for a fee award of $1.125 million representing Thirty percent (30%) of the

common fund (to include all attorneys fees, litigation expenses and incentive/service payment to the named Plaintiff).

Plaintiff filed this class action against Verifications asserting class claims under the FCRA.  Plaintiff alleged that Verifications violated the FCRA, 15 U.S.C. §§ 1692k(a)(1) and 1681i by (1) failing to provide the proper FCRA disclosures to applicants for employment, and to current employees, prior to obtaining a background check; and (2) failing to provide applicants and employees subject to a background check an opportunity to dispute the background check results before discontinuing their application process or employment with Verifications.

More specifically, in what is described below as the "1681k class," the Plaintiff alleges that Verifications furnished background check consumer reports about each class member without providing the notice described in 15 U.S.C. § 1681k(a)(1) "at the time" it first made a report available to its employer customers.[1]  Defendant contended that it was permitted instead to comply with an alternate provision, 15 U.S.C. § 1681k(a)(2).  This dispute was and remains a material disagreement between the parties.

Henderson also alleged a violation of 15 U.S.C. § 1681i for what is described below as the "1681i class."  This section governs the manner in which a consumer reporting agency (CRA) is supposed to conduct a "reinvestigation" when a consumer makes a direct dispute and

---

[1] This FCRA provision states:

> A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall—
>
> (1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported[.]

15 U.S.C. § 1681k(a)(1).

for a CRA such as Verifications that also uses information provided by another CRA, the section governs the manner in which Verifications would have to notify that original source CRA of such disputes.  Henderson alleges that Verifications neither contacted the original source of its own data nor the original CRA that started the alleged inaccuracy in this case.

Of course Verifications denies liability in this case and in fact has contested both the factual allegations and statements of law prosecuted by Henderson.  The settlement agreement itself includes a statement of such denial.  But the Plaintiff's challenge was greater than merely proving that Defendant violated the law.  Instead, Plaintiff's case was alleged as a "willful" violation of the FCRA.  15 U.S.C. § 1681n.  Verifications argued that even if its understanding of the law was incorrect, it was not unreasonable – and not willful.

The Plaintiff's team researched the case and began pre-filing work as early as 2009.  They were retained by Mr. Henderson in early 2011 and formally commenced this action on August 10, 2011.  Several months after the Complaint was filed, the Plaintiff filed an Amended Complaint, which Defendant moved to dismiss (Doc. 21). The Plaintiff opposed dismissal in briefing that was extensive and contentious on both sides. The court denied the motion to dismiss. (Doc. 36).   Meanwhile, both sides served discovery, including issuing subpoenas, scheduling depositions, exchanging and reviewing documents.  Counsel engaged in substantial discovery negotiations through an extensive meet and confer process and resulting supplemental productions.  Plaintiff engaged two nationally known expert witnesses.

Prior to the court's decision on the Motion to Dismiss, as the discovery period for Phase I was to close, the parties began to discuss the possibility of settlement to be facilitated by a private mediator.  The parties engaged Hon. Dennis W. Dohnal, who actively managed the mediation.  Judge Dohnal held multiple in-person all day sessions with all counsel.  Both the

3

insurance representative and Verifications executives participated, with the President of the company attending the final all day mediation in person.

Settlement of the case was complicated in several ways, in particular in categorizing the types of harms that were suffered by distinct groups of plaintiffs under specific sections of the FCRA.  Class counsel sought to negotiate as narrow a release with as substantial a cash recovery as could be fairly achieved.   Mediation was cordial, but contentious.  The Defendant denied all of Plaintiffs' claims, any wrongdoing and any liability to any putative class member. Ultimately, through Judge Dohnal's efforts, a complex, but fair settlement structure was negotiated and put to paper by agreement filed on October 23, 2012.  (Settlement Agreement, Docket No. 39-1).

Additional terms – claims process, notice, costs and attorneys' fees – then also had to be negotiated and agreed. Over the course of several months following the last settlement conference, the parties endeavored to memorialize the terms of the settlement into a Settlement Agreement, practically right up until the moment it was filed with the court.  As explained below, this Settlement is an excellent result for the Class. It provides significant monetary payment to each class member without the risks of further and extended litigation. It includes significant cash payments to class members akin to similar FCRA-class outcomes.   And the settlement has occasioned no attorney, public interest group or government agency (i.e. Attorneys General, Federal Trade Commission) objections.  Out of 41,194 class members that received notice, it has produced 15 requests for exclusion opt outs[2], or a .0004% opt-out rate.[3] The rate of objections is even lower, with one *pro se* objection, representing a .000024 %

---

[2] Fifteen valid opt-out forms and one invalid form were received by the Administrator (i.e. requested to be excluded from the settlement).  (Aff. of Ritesh Patel, McGladrey, Inc. ¶11-12, Ex. A).
[3] In calculating the opt out rate, Class Counsel assumed that 89% of all class members had been successfully found and reached by mail.  The rate of opt outs to the entire class size is just .00036%.

objection rate.  The one objection to the settlement expresses dissatisfaction with the settlement as insufficient a remedy for his injury and deep frustration with consumer reports used in connection with employment without notifying the consumers. Although a valid objection and one that certainly expresses a legitimate concern, it is not an objection sufficient to capsize the agreement, and expresses a larger policy concern rather than one fairly targeted at the settlement. Accordingly, the Parties now ask the Court to order final approval of the Settlement and Plaintiff asks the Court to award attorneys' fees and costs to class counsel.

## II.    THE SETTLEMENT, NOTICE AND CLAIMS PROCESS

### A.    Settlement Terms

The Settlement Fund is divided into three funds to pay out settled claims that fall into two broad categories:  the § 1681i class and the § 1681k class. Section 1681k governs the use of public-record information for employment purposes.  When a CRA reports public information that is "likely to have an adverse effect upon a consumer's ability to obtain employment," the CRA must notify the consumer it is reporting such information identifying the entity to which the information is being provided. 15 U.S.C. § 1681k(a)(1).  The notice to the consumer must be given "at the time" the CRA initially reports the information to its client (usually a prospective employer).  *Id*.  The FTC has concluded that CRAs may send consumers this notice by first class mail.  16 C.F.R. part 600, app. § 614(8).  Defendant contended that they timely mailed the notices for a period after mid-2009 and that the varied delays for mailings before that period would have made class certification impossible.

The Settlement identified two settlement classes.   The Section 1681k class was defined:

(i)      15 U.S.C. § 1681k(a)(1) Class ("1681k Class"):

All natural persons residing in the United States (including all territories and other political subdivisions of the United States) (a.) who were the subject of a Verifications

consumer report, (b.) that was furnished for an employment purpose, (c.) within five years next preceding the filing of this action and during its pendency, and (d.) for whom Verifications notified, as part of the background check process, an employer or prospective employer that additional research was being conducted prior to the completion of the background report, but to whom Verifications did not provide a written notice pursuant to Section 1681k(a)(1) of the FCRA.  Excluded from the class definition are any employees, officers, directors of Verifications, any attorney appearing in this case, and any judge assigned to hear this action.

This class consisted of approximately 41,049 class members.  (Patel Aff. ¶¶ 2, 5). The "1681k class" included all consumers for whom Verifications issued a consumer report for employment purposes requiring notice under § 1681k(a)(1).  In the Section 1681k settlement, class members do not release all of their claims.  In fact, they release only those under this specific FCRA section, 15 U.S.C. §1681k.  So, for example, if a Section 1681k class member also has an individual inaccuracy claim under § 1681e(b), they are not otherwise restricted by the Settlement from prosecution of and recovery upon such claim.   This limited release moots the lone class member objection.

The Section 1681i class is much more limited, with approximately 199 class members, each of whom it is believed previously contacted Defendant to make a dispute.  (Patel Aff. ¶  5).  The 1681i class is defined as:

(ii)      15 U.S.C. § 1681i(a)(6)(a) Class ("1681i Class"):

All natural persons residing in the United States (including all territories and other political subdivisions of the United States) (a.) who disputed to Verifications the accuracy or completeness of a public record reported by Verifications, which resulted from a background check for which Verifications' records show that additional research was conducted (b.) within five years next preceding the filing of this action and during its pendency.  Excluded from the class definition are any employees, officers, directors of Verifications, any attorney appearing in this case, and any judge assigned to hear this action.

Although the release negotiated for this class is broader than that for the Section 1681k class, it is still not a general release.  Only FCRA claims (and related state claims) are released.  However,

as detailed below, these class members are also paid a larger premium and settlement amount for such release.

The total settlement fund is $ 3.75 million, which is a substantial monetary recovery for the settlement class.  If approved herein, class members will receive a gross settlement amount exclusive of attorneys' fees and costs.

**B.     The Notice Process is Complete.**

In accordance with the Court's Preliminary Approval Order, Class Counsel retained a national class administration company to accomplish the notice and claims process for the settlement.  All actions taken by the administrator to date have been under the direct supervision of Class Counsel with many communications, decisions and consultations required between the administrator and class counsel through the notice process.  In addition, the Class Counsel and Defendant's counsel have consulted and worked together throughout the notice and claims process to reach consensus on its day-to-day implementation.

Of the 199 Section 1681i class members that received a class notice via first class mail, the Class Administrator was able to attain a successful delivery rate of 90% of class notices. (Aff. of Leonard A. Bennett ¶ 16, Ex. B). The claims administrator will use the class member names and addresses to mail out a check if the Settlement is approved by the court. *Id.*

The class notice process itself was negotiated and ultimately implemented. This process was certainly the best available given the factors of this case. While it is almost always difficult to obtain current addresses and identification information on class members, especially when a consumer may be facing difficulty finding employment, the Parties and Administrator were able to minimize this problem in this case. Ultimately, the class administrator used a systematic approach to identify, confirm and correct class member addresses using the list it obtained from

Verifications as well as database services. (Patel Aff. ¶ 9). Of the original mailing, only 37 of the 199 Section 1681i class notices were returned as undeliverable. *Id.*

Of the 41,049 Section 1681k class members, the Administrator initially identified 35 records that had no address, thus leaving 41,014 Class Members to whom the Administrator mailed a notice and claim form. (Patel Aff. ¶¶ 2-3). From that mailing, there were 7281 notices that were returned as undeliverable. (Patel Aff ¶ 8). The Administrator undertook a systematic approach to identify, confirm and correct class member addresses, which process located an additional 2,964 addresses to which the Class Administrator re-mailed the notice packages. (Patel Aff. ¶ 8). Ultimately, 4,481 members of the original Section 1681k Class List did not receive mailed notice, yielding a nearly identical delivery rate of 89%. (Patel Aff. ¶ 8).

Despite substantial and best reasonable efforts by the Parties to locate each class member, the "class member not found" percentage will be slightly more than 10% combined. Despite the fact that some class members were not able to be found, this percentage is nonetheless a success. (Bennett Aff. ¶ 18).

## C.     Settlement Results[4]

The minimum net payment to be made to class members is in cash, unconditional and substantial. Consumers will give up few of their rights, release only the narrowest of claims and obtain such benefit without otherwise having to commence any litigation of their own (the period of limitations for most claims would have long ago expired).

---

[4] Plaintiffs have moved the Court for entry of an attorneys' fee and for costs within the customary range of common fund contingency fees. The Court of course must first approve any fee award and Class Counsel does not disrespectfully presume anything in the calculations that follow. However, Class Counsel's estimate of class recoveries will conservatively assume the fee award is granted as moved.

The settlement is structured so that all claimants, except those claiming Actual Damages, will receive a check without having to submit any claim form. Section 1681k class members will at a minimum receive a net payment $51.50.[5] In addition, each member of the Section 1681i class will receive no less than a net cash payment of $563.00.[6]

If a member of either class also submits a valid claim for actual damages based upon a reporting inaccuracy, that class member is also entitled to an actual damages payment. The actual damages payments will be made on a *pro rata* basis from the actual damages fund. As detailed below, under the present response and claims rates, the lowest possible net payment to each of the class members who submitted an actual claim will be $1,066.85.[7] The notice and claims program yielded a claims rate of slightly less than 2% of all Class Members that received notice. A substantial minority of the claims submitted currently lack support or explanation as to an inaccuracy and are being processed by the administrator in order to elicit further class member information. It is likely that the actual damages net payment will be closer to $1,500.00 and is in addition to the statutory payment.

## D.    Class Member Reaction

Unquestionably, the settlement is an excellent result for the class. Indeed, the relatively low number of objections (one *pro se* objection) and opt outs (fifteen)[8] speaks volumes. Whether the Court considers the tens of thousands of class members who neither objected nor opted out, the 1,531 who affirmatively telephoned the Administrator, the 585 who connected to a

---

[5] The gross amount to each 1681k Class Member is $77.66, and the net is $51.50 minus administration costs and, if approved by the court, attorney's fees.

[6] The Actual Damages Claim fund will be $750,000. The gross amount to each of the 703 Class Members who submitted valid claims is $1066.85.

[7] The gross amount to each 1681i Class Member is $804.00, and the net is $563.00.

[8] Of the opt-out requests, the Administrator noted that 255 requests were from persons "whose names were not found on the original mailing lists or they were facially deficient." (Patel Aff. ¶ 13).

live claimant services representative for information about the settlement (Patel Aff. ¶ 13), or the 703 who completed a claim form and affirmatively evidenced their choice, the voice of class members is overwhelmingly positive.  By any account, this settlement is a resounding success for the class members.  In fact, if the Court considers the 703 class members who completed and provided a claim for actual damages, the percentage of objections is still less than .0014 % of the claims made.

The raw numbers of objections and opt out/exclusion requests are minimal.  Given the size of the classes, Class Counsel expected a greater number of "class action attorneys are greedy" or "Verifications, Inc. should be put out of business" objections than were made.  And certainly it is unusual that even professional objectors or "greenmailers"[9] could not find a basis to challenge the settlement.   Nevertheless, the Court should consider the substance of each objection.

Class Counsel usually summarizes the filed objections for organized consideration. However, there was only one objector overall. (Doc. 45).  Though only one objection, it is nonetheless important to address it because it is an understandable expression of frustration over one's consumer report, that the settlement does not pay sufficiently not only to compensate him for his damages arising from the issuance of the Verifications background check report, but also because he feels it doesn't do enough to change Verifications' behavior.  This objection seems to

---

[9] '[P]rofessional objectors' almost invariably groundless objections delay the provision of relief to class members who, in most instances, have already waited years for resolution. Second, by feeding off the fees earned by class counsel who took the risk of suing defendants on a purely contingent basis, as is the normal practice in class actions, professional objectors create a disincentive for class counsel to take on such risky matters. That disincentive clashes with the public interest, repeatedly recognized by courts, to incentivize class counsel to handle such cases."

Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 St. John's L. Rev. 949, 951 (2010).

argue that Verifications should not be permitted to have furnished a report in the first place. The objection, while understandable, is not a basis to reject the settlement.  The 1681k settlement does not affect any individual claims beyond those settled: 15 U.S.C. §1681k.  If the class member has an actual damage claim under the FCRA or any other statute, they retain such claim despite the settlement.  And the set of consumers who are in the 1681k class, and not in the 1681i class, are those who have not previously contacted Verifications to put it on notice of a dispute. Further, there are few attorneys experienced in class litigation with as much experience litigating FCRA claims or with as much experience trying FCRA cases to a jury as that assembled as Class Counsel.  There are certainly no friends of CRAs on the Plaintiffs' side of the litigation.  Yet even with that skill set and bias, it is an impossible argument even for Class Counsel to make that consumer reporting agencies should not be able to collect and report information lawfully, even though the trade is in personal information about individuals without their knowledge or permission.

The objector also believes that the settlement is inadequate because the Defendant should be prosecuted to the fullest extent of the law. The causes of action and the remedies embodied in the FCRA are the enforcement mechanisms to protect consumers from abuse by CRAs. It is possible that a better outcome may be obtained at trial, but it is not without substantial risk to the outcome for the class guaranteed in this settlement.  Many consumers who have been wronged simply want their day in court, and that is why they are permitted to speak at the hearing with proper notice.  In this case, two notices were filed in connection with the hearing.  One Class Member kindly notified the Court that he was unable to attend the hearing (Doc. 44), and another notified the court he wishes to be heard (Doc. 46).

Certainly Class Counsel would much prefer to force the largest possible monetary settlement.  Each counsel has shown themselves as principled consumer advocates over a long series of comparable cases.  But even as self-interested litigators, the genius of a percentage of fund attorneys fee recovery is that it fully aligns the economic interests of counsel with those of the class.  If counsel could have negotiated a larger deal, they certainly would have.  Weighing all the factors, including the risks and potential waste associated with proceeding in litigation to obtain more money, this result is sensible and yields a real monetary benefit for all class members.  Yet even if Class Counsel were able to force a settlement of twice the size, the expectations of a "not enough money" objector would still be unmet, especially when the heart of the wrong he has suffered won't be corrected.  And of course if any class member does have evidence of a valid claim for actual damages, still within the statute of limitations, and they are able to obtain counsel willing to litigate such a case in federal court, the proper procedure is to request exclusion and opt out of the settlement.  *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 430 (4th Cir. 2003)(" Rule 23(c)(2) permits members of a class maintained under section (b)(3) to opt out of the class, providing an option for those Plaintiffs who wish to pursue claims against TPCM requiring more individualized inquiry. Thus, rhetoric aside, Plaintiffs with only direct claims are not being "[j]amm[ed]," "sacrificed" or "caught" in any class action against their will. (citation omitted).")

The objection is properly discounted for another important reason – because 703 claimants have expressly approved it by submitting a claim, and thousands of other class members implicitly voted otherwise.   To accept objections from one consumer who asserts that he would not receive enough money means to abandon the claims from consumers who instead chose to obtain substantial cash and to obtain it now.

12

### III.     ARGUMENT

**A.     The Proposed Settlement is Fair, Reasonable, and Adequate and Should Be Approved.**

**1.     The Standard for Judicial Approval of Class Action Settlements**

There is a strong judicial policy within this Circuit favoring resolution of litigation prior to trial. *See e.g., S.C. Nat'l Bank v. Stone,* 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[t]he voluntary resolution of litigation through settlement is strongly favored by the courts") (citing *Williams v. First Nat'l Bank,* 216 U.S. 582 (1910)). Settlement spares the litigants the uncertainty, delay and expense of a trial and appeals while simultaneously reducing the burden on judicial resources. As the court in *S.C. Nat'l Bank* observed:

> In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources.

749 F. Supp. at 1423 (quoting *Armstrong v. Bd. of Sch. Dirs.,* 616 F.2d 305, 313 (7th Cir. 1980)).

In order to safeguard the interests of the absent class members, all class settlements and the corresponding later dismissal of the case, requires Court approval. Fed. R. Civ. P. 23(e)(1)(A). The process for that approval is governed by Rule 23(e), which provides, in relevant part:

> (e) Settlement, Voluntary Dismissal, or Compromise.
>
> (1)(A) The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class.
>
> (B) The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.
>
> (C) The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.

(2) The parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) must file a statement identifying any agreement made in connection with the proposed settlement, voluntary dismissal, or compromise.

Rule 23(e) thus imposes two basic requirements on the parties and on the Court before the approval of a class settlement and dismissal. First, the Court must determine that notice was directed "in a reasonable manner to all class members." Fed R. Civ. P. 23(e)(1)(B). Second, the Court must determine that the settlement "is fair, reasonable, and adequate." The parties address each of these requirements.

Federal jurisprudence strongly favors resolution of class actions through settlement. *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 59 F. Supp. 2d 1021, 1029 (N.D. Cal. 1999); *see* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."). Rule 23 requires Court review of the resolution of a class action such as this one. Specifically, the Rule provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Court approval is required to ensure that the parties gave adequate consideration to the rights of absent class members during settlement negotiations. *Henley v. FMC Corp.,* 207 F. Supp. 2d 489, 492 (S.D. W. Va. 2002) (*citing In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 158 (4th Cir. 1991)). The Court may approve a settlement only after a hearing and on finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval of a class action settlement is committed to the "sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." *In re MicroStrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d 654, 663 (E.D. Va. 2001).

Additionally, "there is a strong initial presumption that the compromise is fair and reasonable." *Id. (quoting S. Carolina Nat'l Bank v. Stone*, 139 F.R.D. at 339).

In determining whether a given settlement is reasonable, the court should avoid transforming the hearing on the settlement into a trial on the merits regarding the strengths and weaknesses of each side of the case. *Flinn v. F.M.C. Corp*, 528 F.2d 1169, 1172-73 (4th Cir. 1975). Ultimately, the approval of a proposed settlement agreement is in the sound discretion of the Court. *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995)(citing *Jiffy Lube*, 927 F.2d at 158).

### 2.   The Notice to the Class Members was Reasonable.

In a settlement class maintained under Rule 23(b)(3), the class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). Rule 23(e) specifies that "[n]o class action may be "dismissed or compromised without [court] approval,' preceded by notice to class members." Fed. R. Civ. P. 23(e). Rule 23(c)(2) requires that notice to the class must be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* The Court must consider the mode of dissemination and the content of the notice to assess whether such notice was sufficient. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th 2004).

The class list was compiled by the Administrator based on two lists it received from Verifications.  First, the Section 1681k Class list originally contained 41,049 names and addresses of individuals who were the subject of a background check that contained negative

public record information.  (Patel Aff. ¶ 2).  Of those names and addresses, there were 35 records

without an address, but the Administrator was able to find the addresses of 26 of the 35 using a

service branded *Epiq*. (Patel Aff. ¶ 7). The Administrator mailed notices to the remaining 41,040

class members via first class postage as required by the Settlement Agreement.  Second, the

Section 1681i class list was provided to the Administrator with 199 records, who was able to

identify an address for each Class Member.   (Patel Aff. ¶ 6, 7, 9) .  Of the 199 mailed, 37 were

returned by the post office as undeliverable, but the Administrator was able to locate addresses

for and re-mail settlement packages to 18 of the missing Class Members.  Out of all the records

received by the Administrator, only 28 were not mailed for want of an address.  *Id*.

The efforts used to identify class member addresses is absolutely as thorough as could

have been accomplished.  With 41,049 members, it was a large class, but it was also susceptible

of accurate identification because each class member is a consumer about whom Verifications

generated a consumer report, including last known addresses.  With over an 89% delivery rate, it

appears that there is truly no better alternative that could have been attempted.

As this Court has held, "[w]hat amounts to reasonable efforts under the circumstances is

for the Court to determine after examining the available information and possible identification

methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and

amount involved.'" *Fisher v. Va. Elec. & Power Co.,* 217 F.R.D. 201, 227 (E.D. Va. 2003)

(citations omitted). The Supreme Court has concluded that direct notice satisfies due process,

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13 (1985), and other courts – including this

court and others within the Fourth Circuit – have approved mailed-notice programs that reached

a smaller percentage of class members than the class notice reached in this case. *See In re*

*Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail

portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, 3:05cv00143 (E.D. Va. Aug. 29, 2006) (Final Order approving class notice with approximately 85% delivery).

Verifications also served notice of this settlement on the relevant state and federal authorities as required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715. As reflected from the absence of any appearance under CAFA on the Court's docket, none of these agencies or states have objected to the Settlement.

The Parties' efforts to provide class members with notice of the settlement makes in clear that such notice was the best available notice under the circumstances given: (a) the available information; (b) the possible identification methods; (c) the number of class members; and (d) the amount of the settlement. The Parties have complied fully with the Court's Preliminary Approval Order, and have taken reasonable steps to ensure that the Class Members were notified – in the best and most direct manner possible – of the Settlement's terms and excellent benefits.

### 3.   An Analysis of the *Jiffy Lube* Factors Demonstrates that the Settlement is Fair and Reasonable.

The next phase of the Court's determination of compliance with Rule 23(e)(1)(c) typically requires a two-part analysis, often referred to as the *Jiffy Lube* factors. The Court must determine whether the settlement is "fair and reasonable" and then whether the settlement is "adequate." The approval of a proposed settlement agreement is in the sound discretion of the Court. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158.

The first step in the *Jiffy Lube* analysis is a determination as to the fairness of the settlement. The fairness factors are critical to the protection of the class members from unscrupulous class counsel and relate to whether there has been arm's length bargaining. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983); *S. Carolina*

*Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991). The court must consider four factors: (i) the posture of the case at the time of settlement; (ii) the extent of discovery that has been conducted; (iii) the circumstances surrounding the negotiations; and (iv) the experience of counsel. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158-59; *see also In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 663-64; *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995). A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's length negotiations. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339. As described below, the settlement reached in this case is clearly fair and each of the *Jiffy Lube* factors are satisfied.

The Parties agreed to settle only after conducting sufficient merits-related discovery, both formally and informally. The Parties also conducted extensive and substantive settlement talks, including engaging a private mediator for three all-day sessions in Richmond, Virginia, as well as numerous contacts between counsel leading up to and following each settlement session. It was not possible to settle the case at an earlier posture – not only were several in-person mediation sessions required, so too were a great deal of negotiations during the discovery period as well as active litigation. The Plaintiffs filed an amended complaint and engaged in extensive briefing on the dispositive motion; conducted extensive discovery that included review of documents; retention and consultation with multiple experts; interviews with consumers; review of consumer reports; and the review and disclosure of deposition transcripts taken and pleadings available from previous cases with Verifications.

The posture of the case at the time of settlement is a factor that supports approval. *See In re Microstrategy, Inc.*, 148 F. Supp. 2d at 664 (approving of proposed settlement despite the fact that it was reached "early" in litigation). The allegations in this case were that Verifications

failed to provide the proper FCRA disclosures after using a background check to make an employment decision and failed to conduct a reasonable investigation of disputes by consumers concerning their background checks, including not disclosing the original source of the derogatory information.  Although Verifications does not acknowledge any wrongdoing, the consumers from whom it received disputes were entitled to a reinvestigation and correction of their consumer reports.  The consumer reports were used for employment decisions.  Had the case not then settled, the Plaintiffs were sufficiently prepared to move for class certification, which the Defendant was prepared to contest.

There are advantages to the parties and to the docket when opposing counsel are already experts on the legal and factual issues in a case and in a field of practice. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where settlement discussions "were, at times, supervised by a magistrate judge and were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience in the area of securities law). Experienced counsel negotiated the Settlement, making it their first priority bringing the best benefit possible to their clients, and in Plaintiffs' cases, to the Class. *See also* Decl. of Leonard A. Bennett, Exhibit "A."

Leonard Bennett, Matthew Erausquin and Susan Rotkis of Consumer Litigation Associates, P.C., have extensive collective experience in both consumer protection and class action litigation, having been involved in now numerous, large consumer class actions where they have been found to be suitable Class Counsel. *See e.g. Souter v. Equifax Info. Servs., LLC*, 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Souter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court

and others as class counsel in numerous cases."); *See, e.g. Williams v. Lexis-Nexis Risk Mgt.*, No. 3:06CV241 (E.D.Va. 2008); *Beverly v. Wal-Mart*, No. 3:07Cv469 (E.D.Va. 2007); *Capetta v. GC Servs., Inc.,* No. 3:02cv288 (E.D. Va.); *Ryals v. HireRight Sols. Inc.,* No. 3:09CV625 (E.D.Va.), *Daily v. NCO,* No. 3:09CV031 (E.D.Va. 2011); *Conley v. First Tennessee,* No. 1:10CV1247-TSE (E.D.Va.)*; Lengrand v. Wellpoint,* No. 3:11Cv333-HEH (E.D.Va.).

Dale Pittman is qualified, experienced and able to conduct this litigation, as this Court and others have frequently stated. *Id.*; *See Karnette v. Wolpoff & Abramson, L.L.P.*, 2007 U.S. Dist. LEXIS 20794 (E.D. Va. March 23, 2007); *Bicking v. Law Offices of Rubenstein and Cogan*, 2011 U.S. Dist. LEXIS 127173, * 9, n. 9 (E.D. Va., Nov. 3, 2011)(citing *Talbott v. GC Svcs., Ltd P'ship.,* 191 F.R.D. 99, 105 (W.D. Va. 2000)); *Jones v. Vest, No. 3:00cv287, 2000 U.S. Dist. LEXIS 19026, at *12 (E.D. Va. Dec. 27, 2000); Jones v. Vest*, 2000 U.S.Dist.LEXIS 19026, *12 (E.D.Va. 2000); *Kashani v. Integrity Collections*, *et a*l, No. 5:06-cv-73 (W.D. Va.); *Gansauer v. Transworld Sys., Inc.*, No. 7:CV931 (W.D. Va..); *Woodward v. Online Info. Servs.*, 191 F.R.D. 502, 506 (E.D.N.C. 2000); *Randall v. H&P Capital*, No. 3:09-cv-608, 2010 U.S. Dist. LEXIS 74994 (E.D.Va. 2010), adapted in part 2010 U.S. Dist. LEXIS 101509 (E.D.Va. 2010); *Lengrand v. Wellpoint,* No. 3:11Cv333-HEH (E.D.Va.); *Souter v. Equifax Info. Servs., LLC,* 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011).

Christopher Colt North and William Downing are also experienced class action and employment attorneys who, working with Consumer Litigation Associates, have been found to be adequate class counsel in this court and others. Together they have also represented consumers in some of the largest class action settlements in Virginia. *See, e.g. Williams v. Lexis-Nexis Risk Mgt.*, No. 3:06CV241 (E.D.Va. 2008); *Beverly v. Wal-Mart*, No. 3:07Cv469 (E.D.Va. 2007); and *Daily v. NCO,* No. 3:09CV031 (E.D.Va. 2011).

The Parties also engaged in discovery sufficient to aid Counsel and the Court in evaluating Plaintiffs' claims and Defendant's defenses. These facts further point to the conclusion that the Proposed Settlement was the product of arm's-length negotiation by experienced counsel and thus warrants preliminary approval. *See In re Jiffy Lube*, 927 F.2d at 159; *see also Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501-02 (E.D. Va. 1995) (concluding fairness requirement met where "plaintiffs' counsel, with their wealth of experience and knowledge in the securities-class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

The Parties fairly reached the Settlement. An arm's-length negotiation process as in the present instance, with the assistance of a private mediator, who is also a retired United States Magistrate Judge, more than satisfies the requirement that the settlement not be one brokered through "collusion or coercion." *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005); *Weiss v. Regal Collections*, Civ. No. 01CV881-DMC, 2006 WL 2038493, at *2 (D.N.J. July 19, 2006).

### 4.     An Analysis of the *Jiffy Lube* Factors Demonstrates that the Settlement is Adequate

The Court must also determine whether the proposed class settlement is substantively "adequate," the second prong of the *Jiffy Lube* analysis. The Fourth Circuit's decision in *Jiffy Lube* teaches that the adequacy inquiry is guided by evaluating: (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement. *In re Jiffy Lube*, 927 F.2d at 159. Plaintiff has at all times believed that this case was very strong in several regards,

21

including being able to establish basic FCRA liability and that the named Plaintiff was typical

not only of the Class but also of consumers seeking employment requiring a consumer report.

However, the Defendant was prepared at all times to contest the class certification and the

adequacy of the notice. Under the FCRA, liability can be established either upon a showing of

negligent or willful noncompliance.  15 U.S.C. §§ 1681n & 1681o.  If negligent noncompliance

is proven, a consumer may recover actual damages.  In the case of willful noncompliance, a

consumer may recover statutory and punitive damages.  As a practical matter, the Plaintiffs

would have to proceed as a class either under a theory of negligence and thus prove uniform

actual damages, or proceed under a willfulness theory requiring the higher standard of proof in

order to recover statutory and punitive damages. Either way, the Plaintiffs would be required to

produce adequate evidence for a jury to find Verifications violated the FCRA.  Without the

certainty afforded both sides in the approval of the class settlement, all parties would have

proceeded with a long, expensive litigation process likely to culminate in a trial on the merits

followed, no doubt, by an appeal.

     Despite the fact that Plaintiff's counsel and Defendant's counsel were at all times

professional, it was nonetheless contentious as each side zealously represented the interests of

their clients. Verifications retained LeClairRyan, P.C., a prestigious Virginia-based national

law firm with 340 lawyers working in 21 offices nationally. LeClairRyan assigned two of its

shareholders experienced in class action and consumer financial services litigation to this case,

which factor alone could have impacted the outcome of the case at any stage.  Defendant also

retained a second law firm, Kilpatrick Townsend & Stockton LLP, with substantial FCRA

class defense experience to participate in the mediation, in person.

The determination of when it is appropriate to settle a case is one that is entrusted to experienced class counsel. It is often difficult to transition off of a litigation track that is focused on an upcoming trial and meeting the various burdens of proof to a mindset that considers that every case – no matter how conceivably strong it may seem – will always have an element of risk at its core. Settlement is the only outcome that allows both sides to be assured of a certain ending to the litigation, alleviating both the risk and cost inherent in further litigation to both sides, as well as the additional burden on the Court. This case was no exception, and in fair consideration of the strengths and weaknesses (as well as with significant involvement by the mediator), Plaintiffs' counsel felt that settlement was appropriate at this juncture because of the excellent result for both of the classes based on the allegations in the Amended Complaint. *See Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.,* No. 85CV4038, 1987 WL 7030, at *2 (S.D.N.Y. Feb. 13, 1987) (concluding that because continued prosecution of the action would have been expensive and time-consuming, and would have involved substantial risks, "it [was] not unreasonable for the plaintiff class to take a 'bird in the hand'"); *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 547 (D. Colo. 1989) (noting that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush'" in weighing the value of an immediate recovery against "the mere possibility of future relief after protracted and expensive litigation") (quoting *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 740 (D.W.V. 1970)); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 667.

Given the risks to both sides, and the possibility that the Plaintiffs may not prevail at trial, the *Jiffy Lube* factors militate in favor of the adequacy of the settlement. By its terms, the settlement provides substantial monetary consideration to all class members. These benefits realized by the class members immediately are significant, particularly given the time value of

money. A dollar realized today is worth considerably more than the same dollar finally collected years later, even assuming the success on the merits and on appeal, and the ability to collect any judgment that was rendered. This factor weighs in favor of the adequacy of the settlement.

It is convincing that despite mailing 41,220 total notices (combining both the 1681k and 1681i classes), so few class members have objected or opted out. "Such a lack of opposition to the partial settlement strongly supports a finding of adequacy, for '[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.' *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)." *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 668. As the Court has previously explained, "[b]ecause 'the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.' The lack here of any objections to the partial settlement and the small number of class members choosing to opt-out of the case strongly compel a finding of adequacy" *Id.* (citing *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989). "The small number of objections necessarily must be evaluated relative to the size of this Class of over 1 million members. In litigation involving a large class it would be "extremely unusual" not to encounter objections. *See In re Anthracite Coal Antitrust Litig.*, 79 F.R.D. 707, 712–13 (M.D.Pa.1978), *aff'd in part,* 612 F.2d 571 and 612 F.2d 576 (3d Cir.1979)." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 478-79 (S.D.N.Y. 1998). Where "[t]he parties objecting to the settlements are both qualitatively and quantitatively insignificant," their objections may be disregarded. *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1327 (5th Cir. 1981), *cert. denied sub nom. CFS Continental, Inc. v. Adams Extract Co.*, 456 U.S. 998 (1982). Courts recognize that where the class as a whole supports a settlement, it

should be approved.[10]   Indeed, even a small majority of support creates a presumption in favor of

approval.  *See Reed v. Gen'l Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983) (approving class

action settlement where more than 40 percent of class objected or opted out); *Cotton v. Hinton*,

559 F.2d 1326, 1333 (5th Cir. 1977) (nearly 50 percent opted out or objected; settlement

nevertheless approved).

### B.    The Court should approve the request for an award of Incentive Payment, Attorneys Fees and Reimbursement of Expenses.

#### 1.    The Court should award an incentive payment to the Class Representative.

The Court should also approve incentive or service awards for the named Plaintiff.

Plaintiff requests an incentive award of $5,000.00 for his service as the named class

representative. The incentive award is to be deducted from the settlement fund.  In this case, the

Plaintiff took an active role in the case, participated in the crafting of the facts sections of the

pleadings and was answerable to counsel in prosecuting the case. Such awards have been

regularly approved by judges in the Eastern District of Virginia. *See e.g. Beverly v. Wal-Mart

Stores, Inc.*, No. 3:07cv469; *Williams v. Lexis Nexis Risk Mgmt.*, No. 3:06cv241; *Cappetta v. GC

Servs. LP*, No. 3:08cv288-JRS (E.D. Va. April 27, 2011); *Makson v. Portfolio Recovery Assoc.,

Inc.*, No. 3:07cv982-HEH (E.D. Va. Feb. 9, 2009); *Daily v. NCO,* No. 3:09CV31-JAG*; Conley v.

First Tennessee,* No. 1:10CV1247-TSE*; Lengrand v. Wellpoint,* No. 3:11Cv333-HEH.

---

[10] *See, e.g.*, *In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979), *cert. denied
sub nom. Iowa Beef Processors, Inc. v. Meat Price Investigators Ass'n*, 452 U.S. 905 (1981);
*Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981) (small number of objectors demonstrates
fairness of a settlement); *Shlensky v. Dorsey*, 574 F.2d 131 (3rd Cir. 1978) (same); *Bryan v.
Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 494 F.2d 799, 803 (3d Cir.) (20 percent opted out
or objected; settlement approved), *cert. denied sub nom. Abate v. Pittsburgh Plate Glass Co.*,
419 U.S. 900, (1974); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) (thirty-six
percent; settlement approved); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979)
(sixteen percent; settlement approved).

Particularly in light of historical incentive awards both within and outside this District, the incentive awards sought are appropriate. *See e.g. Staton v. Boeing Co.*, 327 F.3d 938, 976-77 (9th Cir. 2003); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).  "An empirical study published in 2006 suggests that incentive awards are granted in only about a quarter of class suits (28%) and that the average award per class representative is about $16,000, with the median award per class representative being closer to $4,000."  4 Newberg on Class Actions § 11:38 (4th ed.)

> **2.     The requested Attorneys Fee is proper as 30 percent of the all cash fund.**

The Supreme Court has consistently calculated attorneys' fees in common funds cases on a percentage-of-the-fund basis. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-67 (1939); *Boeing Co. v. van Gemert*, 444 U.S. 472, 478-79 (1980); *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984); *see also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee awards in common funds cases have historically been computed based on a percentage of the fund). The Supreme Court has never adopted the lodestar method over the percentage of recovery method in a common fund case, even when lower federal courts began using the lodestar approach in the 1970's. *See Shaw v. Toshiba Am. Info. Sys., Inc.* 91 F. Supp. 2d 942, 943 (E.D. Tex. 2000); *see also Manual for Complex Litigation* § 24.121 at 210.

Since *Blum*, virtually every Circuit Court of Appeals has joined the Supreme Court in affirmatively endorsing the percentage of recovery method as an appropriate method for determining an amount of attorneys' fees in common fund cases. *See In re GMC*, 55 F.3d 768, 821-22 (3rd Cir. 1995); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002); *In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st

Cir. 1995); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *Camden I. Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp v. Shalala*, 1 F.3d 1261, 1268-70 (D.C. Cir. 1993); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2nd Cir. 2000).

In the Fourth Circuit, attorneys' fees in common fund cases such as this one are almost universally awarded on a percentage-of-the-recovery basis. *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *1 (M.D.N.C. Jan 10, 2007); *see DeLoach v. Philip Morris Cos.*, No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)); *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va. 1995) (explaining "[a]lthough the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").

The Fourth Circuit has not established a benchmark for fee awards in common funds cases, but district courts within the Fourth Circuit have noted that most fee awards range from 25 percent to 40 percent of the settlement fund. Percentage-fee awards are exactly what the name suggests – class counsel fees are determined as a percentage of the total settlement fund. This Court has recognized the importance of incentivizing experienced class counsel to take on risky cases. *See, e.g., In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d at 788. In fact, a comprehensive study of attorneys fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. of Empirical Legal Studies 27, 31, 33 (2004). This holds true even in instances where the class

recovery runs into the hundreds of millions of dollars. *See e.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d at 295 (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million). *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving award of 36% of $3.5 million settlement fund); *Gwozdzinnsky v. Sandler Assoc.*, No. 97-7314, 1998 WL 50368, 159 F.3d 1346 (2d Cir. 1998) (table) (affirming district court's award of 25% of $1 million common fund) (unpublished); *In re Educ. Testing Serv.*, 447 F. Supp. 2d 612, 631 (E.D. La. 2006)(concluding the customary fee award for class actions "is between 22% and 27%"); *In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *1 (E.D. Mich. June 27, 2006) (awarding fee of 28.5% of $28 million settlement fund); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (awarding 25% of $80 million settlement fund); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (granting attorneys fees in amount of 33 1/3% of $1.5 million settlement fund); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of $3.8 million settlement fund); *Kidrick v. ABC Television & Appliance Rental*, No. 3:97cv69, 1999 WL 1027050, at *1-2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of approximately $400,000 settlement fund, noting that "[a]n award of fees in the range of 30% of the fund has been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (internal citations omitted).

In this case, the Defendant agreed not to oppose Class Counsel's fee requests in the total percentage of 30 % of the full common fund.   As with any class case that they agree to take on, Plaintiffs' counsel live by the result that they obtain for the class members.  In this case, where they bore the risk of the litigation entirely and advanced significant funds in furtherance of the

litigation, Class Counsel submits that fee of 30% of the cash recovered for the class is

reasonable.  Class Counsel in this case has consistently taken the position in all cases that the

attorneys fee should be based on a percentage of the recovery obtained for the class. This has

been true even in cases where the result is an objectively small fee such as in *Mayfield v.*

*Memberstrust Credit Union*, 3:07cv506 (E.D. Va. Nov. 7, 2008), where the class size was so

small that counsel's fee ended up being $8,300.00, well below the actual time counsel had

invested in the case. Indeed, in *Conley v. First Tennessee*, 1:10cv1247 (E.D.Va.), counsel took

the same consistent position with respect to a class of 350 consumer and resulted in recovery of

an approved fee of only $20,000.00. (Docket No. 37).  The same is true in another case,

*Lengrand v. Wellpoint*, No. 3:11Cv333-HEH (Docket No. 42), in which counsel requested a

percentage of fund recovery even though the class size discovered was very small and the fee

requested, $8,550.00, was a small fraction of the large fee counsel actually incurred in lodestar.

In each case, the standards of Rule 23 demand that Class Counsel represent the interest of the

class with the same attention, zeal and competence whether the class is in the hundreds of

thousands such as *Ryals v. HireRight Solutions*, or is less than a hundred as in *Lengrand v.*

*Wellpoint*.

These matters, and others that resulted in dismissal or no class outcome, are the necessary

context for this petition for what in raw dollars may seem to be a very large fee.  In this litigation

as in all class cases, the attorneys who worked on this case have tied their fate to that of the class.

The fee is large in this case for only one reason – both the class and the cash recovery for the

class are large.  Not the potential recovery, or the non-monetary or the abstract value.  The cash

that must leave the Defendant (it already has – it has been paid into an escrow account managed

by the Class Administrator) is for the benefit of the class.  This symmetry of incentives between

counsel and the class motivates Class Counsel to maximize class cash benefit to the largest

degree possible.  If a common fund fee is capped at a dollar value instead of a market percentage,

there would still be an incentive to take such cases, but there would then be a disincentive to stay

the course and litigate through an otherwise low common fund amount.  It must work both ways.

As Judge Young pointedly reasoned:

> Simply put, the class action vehicle is broken. While it may not instantaneously or
> completely resolve the problems that currently inhere in this type of litigation,
> tying the award of attorneys' fees to claims made by class members is one step
> that judges can take toward repair. This approach will not only encourage more
> realistic settlement negotiations and agreements, but also will drive class counsel
> to devise ways to improve how class action suits and settlements operate. *See*
> Deborah R. Hensler and Thomas D. Rowe, Jr., *Beyond "It Just Ain't Worth It":*
> *Alternative Strategies for Damage Class Action Reform,* 64 Law & Contemp.
> Probs. 137, 150 (2001) (" 'The single most important action that judges can take
> to support the public goals of class action litigation is to reward class action
> attorneys only for lawsuits that actually accomplish something of value to class
> members and society.' **To this end, ... analysts recommend[ ] that judges**
> **award fees based on the actual amounts paid out by defendants to class**
> **members, notwithstanding contrary case law." (quoting Deborah Hensler et**
> **al., Rand, Class Action Dilemmas: Pursuing Public Goals for Private Gain-**
> **Executive Summary 33 (1999))). Class counsel will have an incentive to pay**
> **attention to the needs and desires of the class and to "think outside the box"**
> **to devise better notice programs, settlement terms, and claim procedures, all**
> **to the benefit of the consumers who have been harmed.**

*In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 406 (D. Mass. 2008) (emphasis

added).

In this case, Class Counsel shouldered the entire risk of the litigation, appropriately

staffing it with experienced counsel, spending significant time to investigate the case prior to

filing, responding to a dispositive motion, conducting the back and forth of discovery, vigorously

litigating, and finally negotiating over the better part of a year to reach this conclusion.  Doing so

required the litigation of a complex federal case while at the same time attempting to find the

terms where the parties might find compromise.  While the fee will be substantial – certainly so –

it is well deserved and earned.  The risks taken should be compensated, as law recognizes.  But there was certainly substantial investment and risk incurred.  Class Counsel requests a fee based on their earned percentage of the cash fund obtained.  Yet there is no doubt that the excellent outcome in this case for the Class was the result of risk-taking and really hard work by a group of skilled lawyers.[11]

In this case, and in all cases in which Plaintiffs' counsel will come before this Court, they submit that the proper measure of compensation should be driven by the benefit actually obtained for the class members. Because Class Counsel's requested fee of 30% is reasonable under the circumstances of this case and the applicable law, the Court should award it.

## IV.    CONCLUSION

In summary, the Parties have reached a settlement in this case that provides genuine relief to the class members. The settlement is an excellent result considering the contentiousness and status of the litigation, the outcome actively mediated by Hon. Dennis W. Dohnal and the amount of money that will be paid to each class member. Each class member received the benefit of the settlement, regardless of whether they were aware that the Defendant's conduct violated the FCRA and even whether they suffered actual harm. In addition, the terms of the Settlement, as well as the circumstances surrounding negotiations and its elimination of further costs caused by litigation this case through trial and appeal, satisfy the Fourth Circuit's strictures for final approval. The Plaintiffs respectfully move that the Court grant their motion for final approval of this settlement and award the incentive payment and attorneys fees and costs as requested herein.

---

[11] Class Counsel has included various summaries of work performed.  (Bennett Decl., Ex. B). They have not attempted to compile all of their time and expenses, nor have they attempted to edit their summaries for billing discretion, replication or record-keeping errors.  They have each litigated the case as a contingency fee matter.  The records are offered for the single purpose of evidencing the length and complexity of the litigation.

31

Respectfully Submitted,


_____/s/_____
Leonard Anthony Bennett
VSB 37523
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd. Suite 1A
Newport News VA 23601
757-930-3660
757-930-3662
lenbennett@clalegal.com

Susan M. Rotkis
VSB 40693
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd. Suite 1A
Newport News VA 23601
757-930-3660
757-930-3662
srotkis@clalegal.com

Dale Wood Pittman
VSB 15673
The Law Office of Dale W. Pittman, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, Virginia 23803
(804) 861-6000 - Telephone
(804) 861-3368 - Fax
dale@pittmanlawoffice.com

Christopher Colt North
William Downing
751-A Thimble Shoals Blvd.
Newport News, VA 23606
(757) 873-1010
cnorthlaw@aol.com
wdowninglaw@aol.com

*Counsel for Plaintiffs*


<u>CERTIFICATE OF SERVICE</u>

On this 20th day of February, 2013, I certify that I have electronically filed the foregoing pleading in the CM/ECF system, which shall send a Notice of Electronic Filing (NEF) to the following:

Megan Starace Ben'Ary
LeClairRyan PC
2318 Mill Road Suite 1100
Alexandria VA 22314

Charles Kalman Seyfarth
LeClairRyan PC
951 E. Byrd St
Richmond,  VA 23219

*Counsel for the Defendant*

_____/s/_____
Leonard Anthony Bennett
VSB 37523
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd. Suite 1A
Newport News VA 23601
757-930-3660
757-930-3662
lenbennett@clalegal.com